[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13368
_____

D.C. Docket No. 2:17-cv-01791-ACA

CATHERINE REGINA HARPER,
on behalf of herself and those similarly situated,
JENNIFER ESSIG,
SHANNON JONES,

Plaintiffs - Appellants,

versus

PROFESSIONAL PROBATION SERVICES INC,

Defendant - Appellee,

CITY OF GARDENDALE, ALABAMA THE,
a municipal corporation, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(September 25, 2020)

Before NEWSOM and BRANCH, Circuit Judges, and BAKER,[*] District Judge.

NEWSOM, Circuit Judge:

Pursuant to a contract with a municipal court, a private probation company earned a fee for every month that a misdemeanor offender remained under its supervision. We must decide whether the company violated the Fourteenth Amendment's Due Process Clause when, according to allegations that we accept as true for purposes of our review, it unilaterally extended the duration of probationers' sentences, increased the fines that they owed, and imposed additional conditions of probation. We hold that it did.

**I**

The municipal court in Gardendale, Alabama presides over misdemeanor and traffic offenses.[1] When a defendant can't pay a court-imposed fine on the spot, she is placed on probation until she can come up with the money. For nearly two decades, Gardendale outsourced the management of its probation program to a private, for-profit company called Professional Probation Services. PPS supervised probationers until they paid their fines, fees, and costs in full. PPS was compensated for its services—in the words of its contract, "not by the City, but by

---

[*] Honorable R. Stan Baker, United States District Judge for the Southern District of Georgia, sitting by designation.

[1] Because this case comes to us on appeal of a district court's dismissal for failure to state a claim, we accept as true all non-conclusory allegations in the plaintiffs' complaint. *See Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989).

[the] sentenced offenders" themselves.  In particular, PPS collected $40 service fees from its supervisees for every month that they remained on probation.

The mechanics of probation in PPS-era Gardendale worked like this: Following a defendant's conviction, a municipal judge sentenced her to probation by signing an "Order of Probation" form, which specified the "length of probation" (*e.g.*, 30 days), the "type of supervision" (*e.g.*, "until fine, court cost and/or restitution paid"), and any "special conditions" (*e.g.*, "to stay off [certain] property").  The judge separately signed a "Sentence of Probation" form, which included blanks for each of the fields pertaining to the duration of probation, the "total fine," and the payment schedule, as well as an unmarked list of more than a dozen possible probation conditions.  The judge then gave the pre-signed, blank Sentence of Probation form to PPS to complete.

PPS proceeded to fill in the blanks so as to enhance probationers' sentences in one (or more) of at least three ways.  First, PPS extended the duration of probation; as the complaint explains it, "PPS typically assigned individuals to 24 months of probation, even though the Municipal Court's Probation Order regularly specified a shorter period of 12 months."  Second, PPS increased the fines that probationers owed; in one plaintiff's case, for instance, the court imposed a $282 fine, but PPS raised it to $382.  And third, PPS added substantive conditions of probation; the complaint alleges, for example, that "[g]enerally, PPS specified on

3

the [Sentence of Probation] Form that persons . . . must abstain from the use of alcohol or drugs and submit to random testing," even though the Order of Probation form hadn't required either condition. Significantly, no municipal judge ever independently reviewed or approved the enhancements that PPS unilaterally imposed.

PPS's enhancements were treated as part of a probationer's sentence in two respects. First, unless and until a probationer satisfied all obligations imposed by PPS, she couldn't shed her probationary status. Second, if a probationer didn't abide by PPS's enhancements, she was subject to jail-time.

Probationers were required to make monthly payments toward their outstanding fines, fees, or costs. PPS retained the first $40 of each probationer's payment to satisfy its supervisory fee and only paid the remainder, if any, to the municipal court.

Plaintiffs Gina Harper, Jennifer Essig, and Shannon Jones all committed misdemeanor offenses and couldn't pay their fines immediately, so the court placed them on probation with PPS. PPS proceeded to enhance each of their sentences—doubling Harper's probationary term from 12 to 24 months, increasing Essig's fine by $100, and imposing additional conditions on Jones. Harper, Essig, and Jones subsequently sued PPS for damages resulting from their sentence

enhancements.[2]  Most notably, they brought claims under 42 U.S.C. § 1983, alleging that PPS's financial interest in keeping them on probation—so as to continue receiving the $40 monthly fees—violated the Fourteenth Amendment's Due Process Clause.  In particular, they contended that PPS's skewed incentives defied the impartiality that is required of judicial actors and (to a lesser extent) prosecutors.[3]  The plaintiffs also brought a state-law abuse-of-process claim.

On PPS's motion, the district court dismissed the plaintiffs' complaint.  As an initial matter, the court observed that PPS didn't dispute that it "qualifie[d] as a person acting under color of state law" for purposes of the plaintiffs' due-process claim under § 1983.  Even so, the court held that the plaintiffs hadn't shown that "probation officers owe a duty of neutrality" to probationers and, accordingly, that it couldn't "conclude that PPS's financial interest in the administration of probation violated the duty of neutrality."  As particularly relevant here, the court rejected the plaintiffs' contention that PPS performed any "adjudicatory" functions of the sort that might give rise to an obligation of impartiality: The plaintiffs, the court held, "ha[d] not alleged any facts showing that PPS or its employees actually performed adjudicatory functions" because "at every step, the Municipal Court

---

[2] Not long after the plaintiffs filed suit, a municipal-court judge ordered probationers to stop reporting to and paying PPS.  PPS subsequently terminated its contract with the city, and it no longer operates in Gardendale.

[3] Harper and Jones asserted their § 1983 claim on behalf of a putative class.

5

signed off on PPS's actions before PPS even took them." "Regardless of the Municipal Court's relinquishment of its responsibilities," the court reasoned, "the fact remains that the [Municipal] Court—not PPS—performed all adjudicatory functions in this case."

Having dismissed the plaintiffs' federal constitutional claim, the district court separately declined to exercise supplemental jurisdiction over their state-law abuse-of-process claim.

This appeal followed.[4]

## II

Section 1983 provides a cause of action against any person who, "under color of" state law, deprives another of her "rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. The constitutional right at issue in this case is grounded in the Fourteenth Amendment's Due Process Clause, which provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.[5]

---

[4] We review a district court order granting a motion to dismiss *de novo*. *See Gardner v. Mutz*, 962 F.3d 1329, 1338 n.9 (11th Cir. 2020). A complaint may be dismissed for failure to state a claim when, ignoring any "mere conclusory statements," the remaining allegations do not "plausibly suggest" that the defendant is liable. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009).

[5] Before diving into the merits, a bit of housekeeping: Was PPS—a private, for-profit probation company—acting "under color of" state law within the meaning of § 1983 and a "[s]tate" actor for Fourteenth Amendment purposes? As already noted, in the district court PPS didn't contest that it was a state actor for either purpose. To the extent PPS now disputes (however obliquely) that it was a state actor, we hold that it was. Where "deprivations of rights under the Fourteenth Amendment are alleged," the under-color-of-law and state-action requirements "converge." *Am.*

6

As relevant here, the Due Process Clause "entitles a person to an impartial and disinterested tribunal in both civil and criminal cases"—or, stated differently, it imposes a "requirement of neutrality in adjudicative proceedings." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). This rule of impartiality derives from the common law, which has long recognized the principle that "[n]o man is allowed to be a judge in his own cause; because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity." *The Federalist* No. 10, at 59 (J. Cooke ed. 1961); *see also, e.g.*, Edward Coke, 1 *Institutes of the Laws of England* 141 (12th ed. 1738). The Due Process Clause constitutionalizes the judicial-impartiality requirement because, the Supreme Court has explained, it is among "those settled usages and modes of proceeding" that comprise "due process of law." *Tumey v. Ohio*, 273 U.S. 510, 523 (1927). Accordingly, it is by now well-settled that any judge—or, as we will explain below, anyone discharging a judicial function—must be impartial.

---

*Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 n.8 (1999); *Burch v. Apalachee Cmty. Mental Health Servs., Inc.*, 840 F.2d 797, 803 (11th Cir. 1988) (same), *aff'd sub nom. Zinermon v. Burch*, 494 U.S. 113 (1990). State action includes "the exercise by a private entity of powers traditionally exclusively reserved to the [s]tate." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974); *see also, e.g.*, *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985) ("Where a function which is traditionally the exclusive prerogative of the state . . . is performed by a private entity, state action is present."). More specifically, when the government "delegates adjudicative functions to a private party," the latter qualifies as a state actor. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 617 (1993). Because as we explain below, PPS was performing delegated judicial functions, it was a state actor for both § 1983 and Fourteenth Amendment purposes.

So far, so good—and unremarkable.  To decide the case before us, however, we must answer three subsidiary questions: (1) Exactly what does the obligation of judicial impartiality entail?  (2) Does that obligation apply to PPS?  And (3) if so, did PPS violate it here?  We will address those questions in turn.

## A

First, what does the judicial-impartiality requirement entail?  At a bare minimum, the Supreme Court has held that it forbids a judge from adjudicating a case in which he has a "direct, personal, substantial, pecuniary interest."  *Id.*; *see also* Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* *411 (2d ed. 1871).  It thus follows, of course, that a judge's income can't directly depend on how he decides matters before him.  *See Tumey*, 273 U.S. at 523; *Brown v. Vance*, 637 F.2d 272, 282 (5th Cir. 1981).  More broadly, though, the Supreme Court has said that the Due Process Clause forbids any financial interest that "offer[s] a possible temptation to the average man as a judge" to forsake his obligation of impartiality.  *Ward v. Vill. of Monroeville*, 409 U.S. 57, 60 (1972) (quoting *Tumey*, 273 U.S. at 532).  This judicial-impartiality requirement imposes a "stringent rule" that may preclude adjudication even by "judges who have no actual bias."  *Marshall*, 446 U.S. at 243 (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).

8

The Supreme Court has applied the impartiality requirement to invalidate convictions and sentences even when the decisionmaker's financial interest "was less than what would have been considered personal or direct at common law." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 877 (2009). In *Tumey*, for instance, the Court voided convictions arising from a municipal court in which a mayor (sitting as a judge) imposed fines that both funded his salary—he received a salary bump only if he convicted the defendant—and generated sums that went into the town's general treasury for repairs and improvements. 273 U.S. at 520–21. That regime violated the Due Process Clause, the Court held, "both because of [the mayor-judge's] direct pecuniary interest in the outcome, and because of his official motive to convict and to graduate the fine to help the financial needs of the village." *Id.* at 535. So too in *Ward*, the Court invalidated convictions imposed by another mayor-judge on the ground that the fines he imposed constituted a substantial portion of the town's income, despite the fact that his own compensation in no way depended on his decisions. *See* 409 U.S. at 58–60. "The fact that the mayor [in *Tumey*] shared directly in the fees and costs," the *Ward* Court explained, "did not define the limits of the principle"—which, instead, turned on the "possible temptation" of the mayor, whose "executive responsibilit[i]es for village finances may make him partisan to maintain the high level of contribution from [his] court." *Id.* at 60.

9

So, long story short: The Due Process Clause forbids adjudication by a judge who has a financial interest in the outcome of his decisions, provided that the interest—personal or otherwise—is substantial enough to give him a "possible temptation" to forsake his obligation of impartiality.  *Id.*

**B**

Having outlined the judicial-impartiality requirement, we must next decide to whom it applies—and, in particular, whether it applies to PPS.  PPS, after all, is not a judge.  But as the Supreme Court has repeatedly explained, the obligation of impartiality governs not just judges, but anyone acting in a "judicial or *quasi judicial* capacity."  *Tumey*, 273 U.S. at 522 (emphasis added); *Marshall*, 446 U.S. at 248.  The term "quasi-judicial" refers to the performance of a "judicial" function by someone who isn't technically a judge.  *See Quasi-Judicial Act*, Black's Law Dictionary (10th ed. 2009) ("A judicial act performed by an official who is not a judge.").[6]  So if PPS was performing a judicial function, it was acting in a quasi-judicial capacity and was bound by the impartiality requirement.  The decisive question, then, is whether PPS was performing a judicial function.[7]

---

[6] *Black's* defines "quasi-judicial" itself as "[o]f, relating to, or involving an executive or administrative official's adjudicative acts."  *Quasi-Judicial*, Black's Law Dictionary (10th ed. 2009).

[7] The judicial-impartiality requirement has been applied "in a variety of settings"—not just to judges in the traditional sense—"demonstrating the powerful and independent constitutional interest in fair adjudicative procedure."  *Marshall*, 446 U.S. at 243.  To take just one example, the Supreme Court has held that a state board of optometry couldn't provide a fair and impartial hearing because it comprised private optometrists who had a financial interest in revoking their

We hold that it was.  Our analysis begins and ends with the uncontroversial proposition that whatever else the judicial function entails, it includes the power to impose a binding sentence.  *See, e.g.*, *Tumey*, 273 U.S. at 533; *United States v. Heath*, 419 F.3d 1312, 1315 (11th Cir. 2005) ("The Supreme Court has made it clear that imposing a sentence on a defendant is a judicial function.").  So, for instance, the Supreme Court has held that a non-judge official does *not* perform a judicial function when he assesses a penalty that is subject to plenary factual and legal review in court.  *See Marshall*, 446 U.S. at 247, 251.  By contrast, the Court has held that a non-judge official *does* perform a judicial function when his decision regarding a litigant's penalty is not subject to such review.  *See Tumey*, 273 U.S. at 533.  And indeed, we have twice affirmed this proposition specifically in the probation context, holding that probation officers perform a "judicial function" when they determine whether a probationary sentence should include mandatory mental-health treatment.  *See Heath*, 419 F.3d at 1314–15; *United States v. Nash*, 438 F.3d 1302, 1305–06 (11th Cir. 2006).  Along the same lines, we have held that a probation officer was performing a "judicial function" when he

competitors' licenses.  *See Gibson v. Berryhill*, 411 U.S. 564, 578–79 (1973) (explaining that "those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes").

11

established a schedule for restitution payments. *See United States v. Prouty*, 303 F.3d 1249, 1254–55 (11th Cir. 2001).[8]

By these standards, PPS undoubtedly performed a judicial function—and thus acted in a "quasi-judicial capacity"—when it imposed binding sentence enhancements on probationers. As already explained, PPS unilaterally lengthened the duration of probationary terms, increased associated fines, and added substantive conditions. And PPS's enhancements were final—not only were they never subject to plenary review in a separate tribunal, they were consistently treated as binding additions to the probationers' sentences. Essig paid an extra $100 as a result of PPS's sentence enhancement; Harper *went to jail* for failing to comply with hers.[9]

Despite all this, PPS contends—and the district court held—that it didn't perform a judicial function because it imposed its sentence enhancements on a form that had been pre-signed by a municipal judge. We disagree. We have already held that probation officers performed a judicial function when they set

---

[8] Although *Heath*, *Nash*, and *Prouty* all addressed the propriety of delegating Article III "judicial power" to non-judicial actors, *see* U.S. Const., art. III, § 1, their assessment of what constitutes a "judicial function" applies here, as well.

[9] For what it's worth, Alabama law authorizes "court[s]" to "determine[]" the "period of probation" and to "determine" and "modify" the "conditions of probation." Ala. Code § 12-14-13(d), (g). We don't mean to suggest, of course, that state law controls the substance of the judicial function for federal constitutional purposes, but Alabama law's assignment of responsibility further supports our conclusion that PPS was performing a judicial function when it determined the plaintiffs' periods of probation and then prescribed and modified the accompanying terms.

terms of probation, even though they too had pre-authorization from a judge. *See Heath*, 419 F.3d at 1314–15; *Nash*, 438 F.3d at 1305–06.  Unlike after-the-fact plenary review, pre-authorization doesn't render a probation officer's sentence enhancement either non-final or non-binding.  Taken to its logical conclusion, PPS's theory implies that when a court delegates (abdicates?) its judicial function to an entity with a personal financial stake in how that function is performed, *neither* actor violates the Due Process Clause—the court skates because it's not partial, and the delegate gets off because it's not judicial.  That can't be the law.

## C

Because PPS was performing a judicial function, it was bound by the "strict" impartiality requirement applicable to judges.  We have little trouble concluding that PPS's conduct violated that requirement.  PPS, recall, received its $40 monthly fee *only* as long as a probationer remained on probation.  Recall, as well, that PPS unilaterally decided how many months a probationer spent on probation and whether the probationer would be subject to additional obligations that made it more difficult for her to complete her term.  PPS thus had a direct pecuniary interest in maximizing the length of probation: Its income, in the form of the monthly fees, depended directly on how long each probationer remained on the

13

hook. In the eyes of the law, it couldn't determine probation sentencing matters impartially.[10]

## III

To recap, we hold that PPS was acting in a quasi-judicial capacity because it performed a judicial function when it imposed binding sentence enhancements. We further hold that PPS was not impartial because its revenue depended directly and materially on whether and how it made sentencing decisions. Accordingly, we hold that the plaintiffs have adequately stated a claim under the Due Process Clause. We reverse the district court's dismissal of the plaintiffs' due-process claim and remand for further proceedings.

Having rejected the lone basis on which the district court dismissed the state-law claim—that because the plaintiffs' federal claim failed as a matter of law,

---

[10] There is one loose end, which the parties haven't raised on appeal but which is necessary to resolving the plaintiffs' due-process claim: When suing a corporate entity under § 1983, a plaintiff must show that the entity itself committed or caused the constitutional violation. *See Howell v. Evans*, 922 F.2d 712, 724 (11th Cir. 1991); *Ort v. Pinchback*, 786 F.2d 1105, 1107 (11th Cir. 1986). Because § 1983 doesn't hold employers vicariously liable for the acts of their employees, the plaintiffs here must demonstrate that the unconstitutional actions of PPS's employees were taken pursuant to a "policy or custom . . . made . . . by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A "policy or custom" may be established, among other things, by a "pattern of similar constitutional violations." *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

At the motion-to-dismiss stage, the plaintiffs have alleged a sufficient basis to conclude that PPS's "policy or custom" caused their injuries. PPS, they say, "typically" (and "often") extended probation sentences from 12 to 24 months and "[g]enerally" added substantive terms of probation. They further contend that PPS's conduct was part of "one central scheme" that it operated "in materially the same manner every day, with every person assigned to PPS." And, of course, they assert that PPS subjected each of them to similar constitutional violations on different occasions.

the court had discretion to decline to consider their state-law claim—we likewise reverse the dismissal of that claim and remand for further proceedings.

     **REVERSED** and **REMANDED**.